IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| LARRY BILL ELLIOTT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | Case No.: 1:08cv430 |
| v. | ) | |
| | ) | |
| LORETTA K. KELLY, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Larry Bill Elliott was convicted of the capital murder of Dana Thrall, the first

degree murder of Robert A. Finch, and of firearm offenses relating to these murders. After the

first trial ended in mistrial, a second trial was held in the Circuit Court of Prince William County

from March 23 to April 4, 2003. The jury returned guilty verdicts on all counts. After a separate

sentencing proceeding on April 4, 2003, the jury sentenced Elliott to death for the murder of

Dana Thrall, to life imprisonment for the murder of Robert Finch, and to eight years total

imprisonment for the firearms offenses. The jury based the death sentence on the "vileness"

aggravating factor for the murder of Dana Thrall. On May 22, 2003, the trial court imposed its

sentence in accord with the jury's verdicts, and entered final judgment on June 13, 2003. After

unsuccessfully challenging the imposition of the death penalty on both direct appeal and in state

collateral proceedings, Elliott now petitions the Court on writ of habeas corpus pursuant to 28

U.S.C. § 2254. Before the Court is the Petition for Writ of Habeas Corpus (Dkt. No. 22),

Respondent's Motion to Dismiss (Dkt. Nos. 26), as well as other motions pertaining to this

appeal.  For the reasons stated in the following memorandum opinion, it is hereby ORDERED

that Respondent's Motion to Dismiss is GRANTED, Elliott's Petition for Writ of Habeas Corpus

is DISMISSED in full, and the remaining motions are deemed MOOT.

## I.      Facts

The following recitation of essential facts is taken verbatim from the direct appeal

decision of the Supreme Court of Virginia, *Elliott v. Commonwealth*, 593 S.E.2d 270, 273-278

(Va. 2004):

> At approximately 4:00 a.m. on the morning of January 2, 2001, Mary Bracewell, a
> newspaper delivery person, was traveling her route in the Woodbridge community of
> Prince William County, Virginia.  Bracewell was aware that there had been several recent
> vehicle break-ins in the neighborhood and became suspicious when she saw a man
> standing beside a pick-up truck parked on Belfry Lane.  Bracewell observed the man, who
> appeared to be carrying a flashlight, walk to the north end of Belfry Lane, cross the street,
> walk onto a grassy area between two townhouses, and then disappear from her view.
> Bracewell called police on her cellular telephone to report her observations.
>
> At 4:15 a.m., Officer Marshall T. Daniel of the Prince William County Police
> Department received a radio dispatch directing him to respond to Bracewell's call.  He
> arrived at Belfry Lane three minutes later.  Bracewell indicated the parked pick-up truck
> to Daniel and related to him what she had observed.  Daniel noted that the pick-up truck,
> which was locked, had a Department of Defense windshield identification sticker and that
> there was a cellular telephone on the passenger seat.

2

At 4:27 a.m., Officer Daniel received a radio call to respond to a report of a domestic disturbance at a townhouse located at 3406 Jousters Way. Jousters Way is located approximately 300 yards north of Belfry Lane. Although the two streets do not intersect, one can reach Jousters Way on foot from Belfry Lane by walking in the same direction that Bracewell had seen the man beside the pick-up truck walking.

Tina Miller, who lived in an adjoining townhouse, had made the report of a domestic disturbance at 3406 Jousters Way. Miller telephoned police after being awakened by a crashing sound coming from 3406 Jousters Way at approximately 4:20 a.m. As she placed the call, Miller heard three or four "hollow" sounds followed by "the most horrible scream" she had ever heard. Miller thought that the screaming voice sounded like that of Thrall, one of the occupants of 3406 Jousters Way.

Tommy Young, who lived in a townhouse on the opposite side of the street from 3406 Jousters Way, was walking his dog in front of his home at about the same time Miller was awakened by the crashing sound. Young heard two loud "banging noises" coming from 3406 Jousters Way, followed by the sound of a female scream and three more banging noises. Young went back to his house and told his wife to call the police. A few minutes later, Young looked out his front window and saw that the front storm door of 3406 Jousters Way, which had earlier been closed, was swaying back and forth. Young also noted that the front window shades of the home, which were normally left half-drawn, were fully closed.

Officer Scott Bigger of the Prince William County Police Department arrived at 3406 Jousters Way at 4:25 a.m. Officer Bigger knocked on the front door, but got no

3

response. Officer Daniel arrived a few minutes later and walked around to the back of the townhouse. The backyard was enclosed by a privacy fence, and Officer Daniel could hear a large dog barking "pretty hysterically, angry" inside the yard.

Returning to the front of the home, Officer Daniel observed that Officer Bigger had still received no response to his knocking on the front door. Looking through a gap between the shades of a front window, Officer Daniel was able to see the legs of a person lying prone and motionless in the foyer of the home. Officer Bigger opened the unlocked front door and he and Officer Daniel saw Finch, who lived with Thrall in the home, lying on the floor dead. Finch had suffered three gunshot wounds: one to his head, one to his back, and one to his chest.

Officer Daniel immediately returned to the back of the home to secure that area while Officer Bigger waited at the front of the home for additional officers to arrive. When those officers arrived, Officer Daniel immediately returned to the location on Belfry Lane where the pick-up truck had been parked. He arrived at that location at 4:38 a.m. The truck was gone.

Officer Sheldon R. Creamer, one of the officers who had responded to the call by the other officers for assistance, arrived at 3406 Jousters Way at approximately 4:45 a.m. Entering the home, he heard "a muffled breathing sound" coming from the kitchen at the back of the home. In the kitchen he found Thrall, shot and lying in a pool of blood. Emergency medical personal called to the scene took Thrall by ambulance to a helicopter, which in turn evacuated her to the Washington Hospital Center in the District of Columbia, where she later died. Thrall had suffered multiple gunshot wounds including a

4

defensive wound to her right hand, three to her head, and one to her chest. She also suffered a blunt force trauma to the back of her head consistent with a pistol-whipping.

Officer Creamer found that the backdoor was locked by its doorknob lock, but that the door's deadbolt lock was not engaged. He could hear the dog barking in the back yard. Entering the yard from the kitchen, Officer Creamer found that the dog had calmed down. He then determined that the gate of the privacy fence was secured with a locked padlock.

Meanwhile, because Officer Daniel had reported seeing a child looking out of a second floor back window, Officer Bigger reentered the home and went upstairs. There he found Thrall's two sons, aged six and four, who were crying and upset. Police officers removed the children from the home.

The Investigation:

Officer Thomas Leo . . . found a bloodstain on the inside of the gate of the privacy fence. Subsequent DNA testing of this sample showed that it was consistent with Elliott's DNA to a degree that a match would occur "once in the entire world population."

Although a murder weapon was never recovered, forensic testing of ten bullets recovered from the home and during the autopsies of Thrall and Finch confirmed that all had been fired by the same weapon. The bullets were of a type used only in a revolver-type handgun. Gary Arnsten, a firearms expert with Virginia's Division of Forensic Science, testified at trial that because no weapon of this type could hold more than five or six bullets in its revolving chamber, he was certain that the weapon had been reloaded during the commission of the murders.

Detective Charles Hoffman . . . [was] informed . . . that Finch had a prior romantic relationship with Rebecca Gragg . . .

Detective Hoffman and another detective traveled to Fort Meade in Hanover, Maryland, where Elliott worked as a civilian employee for the United States Army as a counterintelligence expert . . . The detectives located the truck in a parking lot at Fort Meade, and Detective Hoffman observed that there was a flashlight, a cellular telephone, and a box of bandages on the seat of the truck.

Elliott told the detectives that Gragg was an employee at a brewing company he owned in West Virginia. He admitted that he had supplied Gragg with a credit card in the name of "Rebecca L. Elliott," but maintained that this had been for business purposes. He also told the detectives that he had been traveling over the New Year's holiday, as had Gragg, and that during that time he had spoken with her several times on his cellular telephone in an effort to arrange a business meeting with her.

Elliott told the detectives that he was aware that Gragg and Finch were involved in a dispute regarding the custody of their two children. Elliott related that Gragg had traveled to Florida over the New Year's holiday and had taken the children with her. He further related that Gragg had told him that she was having car trouble and would not be able to return to Virginia with the children in time to return them to Finch at 2:00 p.m. on New Year's Day as she was required to do under a visitation agreement. Elliott claimed that he had driven to Gragg's residence in the early afternoon of New Year's Day "in case Robert Finch showed up so that [Elliott] could explain to him the problems Rebecca was having with getting back." Elliott denied he had any relationship with Gragg other than

6

as her employer. He also denied knowing Finch and claimed that he had seen him only once.

Although Detective Hoffman told Elliott that his truck had been seen in Finch's neighborhood in the early morning hours of the day of the murders, Elliott denied having been in the area. Elliott claimed that he had spent the night of January first to second sleeping in his truck at a rest area in Maryland . . .

Elliott [later] admitted the true nature of his involvement with Gragg . . . Elliott further admitted that he knew where Finch lived and that, after he had gone to Gragg's house on the afternoon of January 1, 2001, he had driven to Finch's house. He denied getting out of his truck, however, and claimed that he had seen "a black man with a slinky walk going to the front door of the home." . . .

Elliott admitted that after calling Gragg, he drove to Finch's neighborhood. He admitted leaving his truck, claiming that he did so only because he needed to urinate. Elliott stated that after urinating by a guardrail on the side of the road, he walked by Thrall's and Finch's townhouse. He denied going onto the property and stated that he had not heard gunshots, a scream, or anything unusual. At the conclusion of this interview, Detective Hoffman took a photograph of an abrasion he had noticed on one of Elliott's hands.

On January 4, 2001, Gragg, . . . admitted receiving a telephone call early on the morning of the murders, but claimed that the call had come from Finch. Gragg claimed that Finch had threatened to call the police if she did not return their children to him that afternoon. Gragg also told the detectives that she did not believe that Elliott had

7

committed the murders.

On January 7, 2001, . . . Elliott admitted that he had been in Finch's neighborhood "hundreds of times." . . .

On January 8, 2001, . . . testing of samples collected from the underside of the truck's floor mats showed a trace residue of blood, though the samples were too small for accurate DNA testing. A further blood sample found in the seat cushion was consistent with Elliott's DNA . . .

On May 10, 2001, . . . Gragg told the police that the telephone call she had received early on the morning of the murders was not from Finch, although initially she had assumed it was because the connection was not good and she could not hear the caller clearly. Gragg then related that when the caller realized that she thought she was talking to Finch, the caller said he was "tired of this s*** and was going to take care of it" and hung up. Gragg then realized that the call had come from Elliott . . .

Elliott told her that "all of our problems had been taken care of." . . . Later, Elliott told Gragg that he was looking for a place "to dump . . . these bloodied black trash bags from the mess that Jerry had made."

Gragg told the police that she had not been truthful in her prior interviews because she was afraid of Elliott and "Jerry," because Elliott had once told her that "Jerry" was watching her and that he would kill her or her family if she went to the police. Once Elliott was in custody and the police had assured her that there was no "Jerry," she stated that she had decided to be truthful. Gragg's attorney confirmed that she had told him on several occasions that she feared Elliott would harm her if she told the police what she

knew.

## II.     Procedural History

Elliott was charged in Prince William County Circuit Court with the Capital Murder of

Dana Thrall, under Va. Code § 18.2-31 (killing of more than one person as part of the same act

or transaction); First Degree Murder of Robert Finch, under Va. Code § 18.2-32; and with two

firearm offenses related to the murders. Elliott's first jury trial, from July 15 to July 31, 2002,

ended in a mistrial. He was convicted on all counts after a second trial from March 23 to April 4,

2003.

Elliott filed appeals of his convictions, which were consolidated and heard by automatic

priority appeal before the Virginia Supreme Court. On March 5, 2004, the Virginia Supreme

Court affirmed Elliott's convictions and the sentence of death in an extensive opinion. *See*

*Elliott v. Commonwealth*, 593 S.E.2d 270 (Va. 2004). Thereafter, Elliott sought a writ of

certiorari in the Supreme Court of the United States, which the Supreme Court denied on January

10, 2005. *See Elliott v. Virginia*, 543 U.S. 1081 (2005).

On March 11, 2005, Elliott filed a 74-page original petition for writ of habeas corpus in

the Virginia Supreme Court. After the Virginia Supreme Court denied his motion for leave to

exceed the page limits, Elliott filed his 50-page petition, with 49 supporting affidavits, and the

Warden moved to dismiss. Elliott filed a number of discovery motions in June 2006, including a

Motion for Preservation and Transfer of Evidence Pursuant to Virginia Code § 18.2-270.4:1.

The Prince William County Circuit Court conducted a hearing on this motion on July 8, 2006,

and ordered preservation of human biological evidence on August 11, 2005. On April 24, 2006,

9

Elliott filed with the Virginia Supreme Court a Petition for a Writ of Mandamus to the Circuit

Court, asking for an order to transfer to the Virginia Department of Forensic Sciences all human

biological evidence from the murders that had been collected by any government entity. On

August 1, 2006, the Virginia Supreme Court dismissed the petition. After Elliott moved for an

order requiring the Prince William County police and Commonwealth's Attorney to comply with

the August 11, 2005 order, the Circuit Court held another evidentiary hearing on November 28-

29, 2006. At the conclusion of this hearing, the Circuit Court ordered the police department to

transfer all physical evidence in the case to the Division of Forensic Science.

On November 2, 2007, the Virginia Supreme Court dismissed Elliott's petition and

denied Elliott's related discovery motions. *Elliott v. Warden of Sussex*, 593 S.E.2d 465 (Va.

2007). On March 6, 2008, the Virginia Supreme Court denied Elliott's Petition for Rehearing.

On May 6, 2008, this Court stayed Elliott's execution, and granted Elliott's request to file a

Petition for Writ of Habeas Corpus. On July 3, 2008, Elliott filed his Petition for Writ of Habeas

Corpus in this Court. Elliott's petition sets out the numerous grounds for relief, which are

summarized in short form as follows:

A.    Counsel Rendered Ineffective Assistance at Guilt Phase.
1. Failure to Interview or Call Alibi Witnesses.
2. Failure to Obtain Business Records and Failure to Call Experts.
3. Failure to Interview and/or Call Witnesses Regarding the Cleaning of Elliott's Truck.
4. Failure to Interview and/or Call Witnesses Regarding Evidence of other Suspects.
5. Failure to Call Larry Smith.
6. Failure to Interview and/or Call Witnesses Regarding Silencers.
7. Failure to Interview and/or Call Witnesses as to Elliott's Peacefulness and Nonviolence.
8. Counsel Unreasonably Failed to Investigate and Prepare for Trial
9. Failure to Object During Opening.

10. Promising Jury It Would Play Tape and Not Playing It.
11. Portraying Gragg as the Actual Murderer.
12. Failure to Adequately Address the Blood on the Back Gate.
13. Failure to Object to Inadmissible, Prejudicial Evidence of Uncharged Crimes and of Collateral Events.
14. Failure to Effectively Move for a Dismissal.
15. Failure to Put on a Defense.
16. Failure to Object to the Prosecution's Improper Closing Arguments.
17. Cumulative Prejudice to Elliott.

B. Counsel Rendered Ineffective Assistance at the Penalty Phase.
1. Failure to Adequately Develop and Present Mitigation Evidence.
2. Failure to Renew Penalty Phase Motions Raised in Trial 1.
3. Failure to Object to Improper and Prejudicial Victim Impact Testimony.
4. Failure to Object to Prosecution's Improper Closing Arguments.
5. Failure to Seek Continuance or Other Relief Based on the Pre-Sentence Report.
6. Cumulative Effect of Counsel's Ineffective Assistance in the Penalty Phase Prejudiced Elliott.

C. Claims Relating to the Jury Instructions/Verdict Forms.
1. The Failure to Request the "Mere Presence" Instruction at Guilt Phase.
2. The Absence of the "Triggerman" Instruction at Guilt Phase.
3. Failure to Object to the Capital Murder Instruction and its Verdict Form at Guilt Phase.
4. Failure to Object to the Verdict Form for the Finch Murder at Guilt Phase.
5. Failure to Request a Victim Impact Testimony Instruction at Penalty Phase.
6. Errors in Signed Capital Murder Verdict Form at Penalty Phase.
7. Failure to Provide Proper Verdict Form For the "Life In Prison" Sentence at Penalty Phase.
8. Multiple Assignments of Errors and Claims Regarding Instruction No. 1 and the Signed Capital Verdict Form at Penalty Phase.
9. Failure to Request Instructions that the "Defendant is Presumed Innocent of the Aggravating Factors," that "He Does Not Have to Testify In the Penalty Phase, and On the Definition of "Reasonable Doubt."

D. Counsel Rendered Ineffective Assistance On Direct Appeal.
1. Failure to Assign Error to the Evidentiary Penalty Phase of Trial.
2. Failure to Argue Assignments of Error.
3. Failure to Cite Authority Requiring the Adoption of a Narrowing Instruction Regarding the Three Vileness Factors.
4. Failure to Argue that the Jury's Verdict was not the Product of a Reasoned and Dispassionate Deliberation.

11

E.   Cumulative Effect of all Preceding Ineffective Assistance of Counsel Claims.

F.   The Handwritten Note Found in the Appellate Record.

G.   The Post-trial Destruction and/or Release of Human Biological Evidence Violated Elliott's Due Process Rights.

H.   The Exclusion of Polygraph Evidence Violated Elliott's Right to Confront Witnesses.

I.   Claims Found Procedurally Defaulted By the Virginia Supreme Court.

    a.   Claims under *Brady v. Maryland*.
       1.   Failure to Produce Statements of the Thrall boys.
       2.   Failure to Produce Photographs Provided by Victim Robert Finch's Parents.
       3.   Failure to Produce Alleged Tape Recording of "the Smoke Break Conversation" and Statements Regarding that Conversation.
       4.   Failure to Produce Third Polygraph Report.
       5.   Failure to Comply With Constitutional Duties.
       6.   Cumulative Materiality.

    b.   Claims under *Napue/Giglio*.
       1.   The Commonwealth Sponsored Perjured Testimony from Officer Leo.
       2.   The Commonwealth Sponsored Perjured Testimony from Detective Hoffman and Gragg.
       3.   The Alleged May 10, 2001 Written Statement.

    c.   Miscarriage of Justice.

## III.   Standard of Review

The federal habeas statute, the Antiterrorism and Effective Death Penalty Act (AEDPA), provides "a highly deferential standard for evaluating state court rulings." *Bell v. Cone*, 543 U.S. 447, 455 (2005). This deferential standard strictly constrains federal review of a petition for habeas relief from a state conviction and sentence. Specifically, the federal habeas statute mandates that federal habeas relief is only proper when state court proceedings:

i) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States; or
ii) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has interpreted these provisions as requiring considerable deference upon federal review of state court proceedings. A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts "materially indistinguishable" from a Supreme Court decision and arrives at a result different than that dictated by Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *see also Lovitt v. True,* 403 F.3d 171, 178 (4th Cir. 2005). Similarly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 178 (quoting *Williams*, 529 U.S. at 411). An application of federal law is unreasonable when the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *See Lenz v. Washington*, 444 F.3d 295, 300 (4th Cir. 2006) (quoting *Rompilla v. Beard*, 545 U.S. 374 (2005)).

Furthermore, on federal habeas review, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003). The court must presume a factual determination

13

made by the state court to be correct unless the habeas petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

These established principles provide the framework upon which this Court reviews Elliott's habeas claims.

## IV.    Merits Review

### A.    *Counsel Rendered Ineffective Assistance at Guilt Phase.*

Elliott asserts seventeen grounds for ineffective assistance of counsel at the guilt phase of his trial, and eight grounds for ineffective assistance at the penalty phase of trial.  Under *Strickland v. Washington*, a successful claim for ineffective assistance of counsel requires proof that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance of counsel prejudiced the defense.  466 U.S. 668, 687 (1984).  Under the "performance" prong of the *Strickland* test, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.  Under the "prejudice" prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

On state habeas appeal, the Virginia Supreme Court rejected each of Elliott's claims for ineffective assistance of counsel.  *See Elliott v. Warden of Sussex*, 593 S.E.2d 465, 473-489 (Va.

2007). Upon careful review of the record and transcripts, this Court agrees with the Virginia

Supreme Court that Elliott has not shown ineffective assistance of counsel, and dismisses these

claims for the reasons detailed below.

     1.     <u>Failure to interview or call alibi witnesses.</u>

     Elliott argues that counsel failed to call three alibi witnesses, his co-worker Todd Prach,

his wife Kathy Elliott, and his daughter Kaitlynn Elliott. According to Elliott, Mr. Prach would

have testified that he spoke with Elliott between 5:00 and 5:30 a.m. on the morning of the

murders at their workplace at Fort Meade, Maryland. This testimony allegedly would have

refuted the Commonwealth's theory of the case because Elliott could not have committed the

murders, cleaned up, disposed of the evidence, and arrived at Fort Meade by 5:30 a.m.

     The Court agrees with the Virginia Supreme Court that this claim fails to satisfy the

"prejudice" prong of *Strickland*. *Elliott v. Warden*, 652 S.E.2d at 473. The record shows that

Elliott's truck was seen in the neighborhood as early as 4:15 a.m. on the morning of the murders

and that he was no longer in the house when police responded at 4:25 a.m., and he admitted he

was in the neighborhood at the time of the murders. There was no testimony at trial as to how

long he spent cleaning the crime scene or disposing of evidence, or exactly when he did so. Even

had Mr. Prach testified that he saw Elliott between 5:15 and 5:30 a.m. at Fort Meade, there was

sufficient time for Elliott to drive to Fort Meade after the murders. In short, there is no

irreconcilable conflict with the timeline presented at trial, and therefore there is not a reasonable

probability that the result at trial would have been different but for counsel's decision not to call

Mr. Prach. *Strickland*, 466 U.S. at 687.

Elliott's wife, Kathy Elliott, allegedly would have testified that she saw him in their home around 6:00 a.m. on the morning of the murders. She allegedly would have testified that Elliott returned from travel that morning, that she watched him unload his truck and saw no sign of blood or a cleanup of a crime scene, and that his customary practice was to shower upon return from a trip. But Kathy Elliott's own affidavit stated that Elliott showered and did laundry immediately after arrival, which supported an inference that he did so in order to remove evidence linking him to the murders. The prosecution theory at trial was that Elliott cleaned up his truck and disposed of the evidence prior to his arrival at home at 6 a.m., which is consistent with Kathy Elliott's proffered testimony. And, as the Virginia Supreme Court noted, because Elliott had defrauded his wife out of savings – acting in concert with another woman – defense counsel hardly can be faulted for not calling her as a witness given her potential bias. *Elliott v. Warden*, 652 S.E.2d at 474.

Kaitlynn Elliott's proffered testimony was not relevant. Kaitlynn Elliott did not see her father until hours after the murders – around 7:15 a.m. – leaving plenty of time for him to dispose of trash bags and clean his truck. Moreover, her affidavit does not square with evidence that his truck had a hard cover that blocked the truck bed from view. Finally, Elliott certainly knew the substance of the testimony his wife and daughter now proffer, and cannot now fault his counsel for failing to call alibi witnesses he failed to bring to counsel's attention.

### 2.    Failure to Obtain Business Records and Failure to Call Experts.

Elliott claims that counsel failed to obtain exculpatory records, including: cell phone tower records for Gragg's and Elliott's cell phones, to demonstrate which cell towers were used to send and receive calls. Elliott contends this was critical because without the cell tower

16

records, he was unable to prove that he made a 5:23 a.m. phone call from his office parking lot, not Kaufman's Restaurant, which was 6.6 miles away; Thrall and Finch's bank and other financial records, which supposedly would have shown that Finch lacked a legitimate source of funds to purchase a $300,000 house; and medical records from the hospital where Finch received treatment after being beaten by Gragg's friends and relatives. Elliott also asserts ineffective assistance because counsel failed to call a crime scene/blood spatter reconstruction expert, who allegedly would have provided evidence supporting an inference that multiple persons committed the murders.

The Virginia Supreme Court rejected each of these claims, holding that they satisfied neither the "performance" nor the "prejudice" prongs of *Strickland*. It found that Elliott merely speculated as to what the cell phone records and financial statements would have shown, which did not support an ineffective assistance claim. As to the failure to call a blood spatter expert, the Virginia Supreme Court rejected the theory of multiple killers as being inconsistent with the crime scene evidence showing that each bullet was fired from the same gun. *Elliott v. Warden*, 652 S.E.2d at 476-477.

This Court agrees. The Court does not see the relevance of Finch's medical records showing that he received hospital treatment, or the relevance of Finch and Thrall's financial records. The blood spatter expert would not have rebutted the evidence that a single gun was used in the killings, nor would it have rebutted the fact that Elliott's blood and DNA was found on the back fence behind the house. Thus, the Court holds that these claims fail under *Strickland*.

      3.      <u>Failure to Interview and/or Call Witnesses Regarding the Cleaning of Elliott's</u>

Truck.

Elliott argues that counsel erred by failing to call several witnesses, including his wife Kathy Elliott and his former wife Sandy Rooks, who would have testified to his lifelong habit of compulsively cleaning his vehicles. His friends Chris McSpadden and Robert Barrow allegedly would have testified that beer was spilled in his truck at a tailgate party a few days before the murders, which would have provided an alternative explanation for why Elliott cleaned his truck mitigated or negated the inference that he cleaned the truck to destroy evidence.

The Virginia Supreme Court found that such testimony would have bolstered the Commonwealth's case by reinforcing expert testimony that a thorough, recent cleaning of the truck could have removed any evidence of crimes. 652 S.E.2d at 475. Moreover, the purported testimony that Elliott cleaned his truck days prior to the murders is not probative as to whether he cleaned his truck immediately after the murders to destroy evidence. *Id.* This Court agrees with the Virginia Supreme Court that these claims fail to demonstrate ineffective assistance of counsel under *Strickland.*

### 4.   Failure to Interview and/or Call Witnesses Regarding Evidence of Other Suspects.

Elliott contends that counsel was ineffective for failing to introduce evidence of other suspects, such as Gragg's husband and relatives, who supposedly had a motive to kill Finch. Elliott proffers that Finch had been beaten by Gragg's relatives and argues that these relatives should have been investigated as suspects. Jennifer Finch, the victim's sister, allegedly would have testified that her inspection of her brother's home after the murders revealed a missing computer, drug paraphernalia, and missing cash. William Thrall, the other victim's father,

18

allegedly would have testified that he found drug paraphernalia at the house, and that the police refused to investigate further.

The Virginia Supreme Court found that these claims satisfied neither prong of the *Strickland* test because the trial court found no evidence of third party involvement and thus testimony on alternative theories would not have been admissible under *Johnson v. Commonwealth*, 529 S.E.2d 769 (2000), *cert. denied*, 531 U.S. 981 (2000); *Elliott v. Warden*, 652 S.E.2d at 475. This finding was affirmed on direct appeal. *Elliott v. Commonwealth*, 593 S.E.2d at 287-88. This Court agrees. Elliott is merely postulating that others might have had motives to kill Finch. Even if admitted, none of this purported testimony or evidence would have given the jury a sound evidentiary basis for concluding that another suspect committed the murders. Accordingly, it was not ineffective assistance for counsel not to introduce these witnesses, and these claims are denied.

### 5. Failure to Call Larry Smith.

Counsel did not call Larry Smith, a friend of Finch who bred Finch's 150 pound Mastiff dog. Smith allegedly would have testified to various things Finch told him about his finances, that Finch kept a lot of money around the house and that he trained Finch's Mastiff and knew the dog was prone to biting intruders. Elliott argues that this testimony, if admitted, would have undermined the prosecution theory that he went out the back door past the Mastiff and left his blood on the back gate.

The jury's conviction rested in part on unimpeachable DNA evidence – his blood on the gate – that Finch was in the backyard near the time of the murders. Nor would Smith's testimony

19

about the dog have undermined confidence in the verdict, given the testimony from Officer

Creamer that he entered the backyard without rousing the dog.  Much of Smith's proffered

testimony amounts to inadmissible hearsay, and the remainder of it (*e.g.*, Finch kept a lot of

money around the house) was not prejudicial to Elliott.  Moreover, the fact that Smith testified at

the first trial, but not the second, gives rise to an inference that counsel had tactical reasons for

not calling him again.  *Strickland*, 466 U.S. at 689.  As such, this Court joins the Virginia

Supreme Court in rejecting these claims.  *Elliott v. Warden*, 652 S.E.2d at 476.

6.     Failure to Interview and/or Call Witnesses Regarding Silencers.

Five days before the murders, Elliott emailed Mr. Randon Jackson urgently seeking to

acquire a silencer, allegedly for use at a shooting range.  Mr. Jackson testified that using silencers

at a shooting range was "ludicrous" and "silly."  Elliott now claims that counsel should have

called witnesses who would have testified that he had conversations with them regarding

silencers at a shooting range.  This might have discredited the prosecution's theory that Elliott

was seeking silencers to use in the murders and using the shooting range as a pretext for

acquiring the silencers in his emails with Mr. Jackson.  The affidavits of two of Elliott's

witnesses, Mr. Robert Booher and Mr. David Dyke, mentioned nothing about communicating

with Elliott regarding silencers.  Mr. McSpadden's affidavit mentions conversations about

shooting ranges, generally, but does not specifically aver that he discussed obtaining silencers

with Elliott or that Elliott was the one who mentioned silencers for use at shooting ranges.  None

of this testimony would have undermined the prosecution's evidence that Elliott sought silencers

from Mr. Jackson five days before the murders, or the inference that he used the pretextual

purpose of a shooting range.  The Court concludes that these claims do not satisfy the

"performance" or "prejudice" prongs of *Strickland.*

> 7.    Failure to Interview and/or Call Witnesses as to Elliott's Peacefulness and
>       Nonviolence.

Elliott claims that counsel erred by failing to call various witnesses to testify as to his

reputation for peacefulness and non-violence. He claimed that 15 such witnesses were identified

in the habeas investigation, and that with such testimony Elliott would be entitled to a jury

instruction that his character be considered in determining guilt or innocence. The Virginia

Supreme Court found that these claims failed both prongs of *Strickland.* 652 S.E.2d at 476. The

Court agrees. Given the overwhelming evidence of Elliott's commission of these murders,

including the DNA evidence on the back gate and witness testimony and his own admissions

placing him at the scene at the time of the murders, there is no reason to believe that the result at

trial would have been changed by character testimony. This is particularly true given that these

character witnesses did not know about his other life with Gragg, or how he and Gragg conspired

to defraud his wife. As the Virginia Supreme Court put it, "petitioner cannot demonstrate that

testimony as to petitioner's reputation in those limited areas of his life would have had any

significant impact on the jury's decision." *Id.* Accordingly, the claims fail both the performance

and prejudice prongs of *Strickland.*

> 8.    Counsel Unreasonably Failed to Investigate and Prepare for Trial.

Elliott claims that his counsel failed to adequately prepare for the second trial by failing

to adequately investigate or to effectively counter the prosecution's trial strategy. This Court is

mindful of the Supreme Court's admonition that "[j]udicial scrutiny of counsel's performance

21

must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. In light of this high burden, a habeas petitioner cannot prevail on general or boilerplate claims that counsel was ineffective because he or she did not "effectively counter" the opposition's trial strategy. Elliott points to no case holding that counsel was ineffective because he or she failed to effectively counter the prosecution's trial strategy at a second trial after an initial mistrial. Further, Elliott's assertion that his counsel failed to investigate for the second trial ignores the fact that Mr. William Moffitt was his counsel at both trials, and therefore could rely on his investigation from the first trial. Counsel are not required to duplicate investigative work to avoid being ineffective. Accordingly, this claim must be denied.

9.     Failure to Object During Opening.

Elliott next asserts ineffective assistance because his counsel failed to object during the prosecution's opening statement, which "speculated about elements of the crimes that were never supported by evidence." He lists several examples of objectionable statements during the opening, such as "Dana [Thrall] was murdered because she . . . witnessed the execution of Finch." The evidence at trial, however, supported an inference that Elliott's motive for killing Ms. Thrall was that she witnessed him shooting Finch. Elliott also argues that the prosecution accused him of crimes other than the ones charged in the indictment, such as stealing from his wife. Under Virginia law, however, the Commonwealth is allowed to show evidence of other crimes "if the evidence is connected with or leads up to the offense for which the accused is on

22

trial." *Woodfin v. Commonwealth*, 372 S.E.2d 377, 380-381 (Va. 1988). Therefore this Court agrees with the Virginia Supreme Court that the "record . . . demonstrates that the Commonwealth's opening statement constituted a fair depiction of the evidence to be presented and a fair inference of what the evidence would prove and, thus, was not objectionable." *Elliott v. Warden*, 652 S.E.2d at 477.

      10.     Promising Jury It Would Play Tape and Not Playing It.

      Elliott's counsel promised during opening statement to play an audio tape of a phone conversation between Elliott and Gragg in which he denied his guilt. When counsel attempted to play the tape during cross-examination of Gragg, the trial court ruled it inadmissible, but ruled that counsel could offer the tape during its case-in-chief. Counsel elected not to play the tape. Elliott contends this tactical trial decision constituted ineffective assistance of counsel. The Virginia Supreme Court disagreed, holding that because counsel obtained Gragg's admissions to facts that it planned to establish with the tape, the decision not to play the tape was reasonable. 652 S.E.2d at 477-78. Moreover, the tape contained statements that would have been harmful to the defense, such as Elliott repeating that he was at the townhouse at the time of the murders. Accordingly, this claim fails the *Strickland* test.

      11.     Portraying Gragg as the Actual Murderer.

      Elliott next asserts that counsel erred by suggesting in its opening statement that Gragg might have committed the murders, which allowed the prosecution to counter at trial that Gragg was nowhere near the scene. This misstates the opening statement, which rhetorically asked "Who was the person that benefitted from this?" At most, this statement implied that Gragg had

a motive and may have manipulated Elliott into murdering Finch. It does not imply that she committed the murders herself. This Court joins the Virginia Supreme Court in rejecting this claim. *Elliott v. Warden*, 652 S.E.2d at 478.

 12. Failure to Adequately Address the Blood on the Back Gate.

 Elliott contends ineffective assistance because counsel did not adequately address or refute the presence of Elliott's blood on the inside of the back gate at the townhome where the murders occurred. There is little doubt as to the significance of this piece of physical evidence – it placed Elliott, bleeding, at the scene of the murders. It is unclear how counsel could have countered such damning evidence. It is beyond dispute that Elliott's blood was found on the inside of a padlocked gate in the backyard, and there was no evidence adduced at trial explaining how his blood was left there another time. The chain of custody was established beyond dispute at trial, Officer Leo collected the blood and delivered it to the Virginia Department of Forensic Science. It is not ineffective assistance to refrain from raising theories for which there is no supporting evidence, or refrain from making objections that have no merit.

 13. Failure to Object to Inadmissible, Prejudicial Evidence of Uncharged Crimes and of Collateral Events.

 Elliott asserts that counsel failed to object to evidence of his alleged "theft" of money from his wife's account; his alleged "rape" of Gragg when she was sedated prior to surgery; the alleged illegal attempt to obtain a silencer, a felony under the Virginia Code; and his alleged attempt to flee and evade the police. He cites Virginia cases holding that collateral facts prejudicial to the defendant are not admissible. *See, e.g., Seilheimer v. Melville*, 295 S.E.2d 896

24

(Va. 1982). But these facts were not collateral. As the Virginia Supreme Court determined, such evidence was relevant to Elliott's motive by showing that he would consider killing Gragg's ex-husband Finch in a twisted attempt to curry favor with her, as well as acts he took in furtherance of his plan to kill Finch. Gragg testified about the theft of money from Elliott's wife, which showed the intertwined nature of her relationship with Elliott and further established background relating to his motive. *Elliott v. Warden*, 652 S.E.2d at 478-479. Evidence of Elliott's attempt to obtain a silencer clearly was relevant to his plan to use a firearm to commit murder and escape detection. Finally, Elliott misstates Hoffman's testimony about Elliott's supposed attempt to flee; the entirety of Hoffman's testimony was that Elliott drove fast, leading Hoffman to fear that he was trying to flee, but then Elliott told him he was going to turn himself in.

In short, these claims do not meet the "performance" or "prejudice" prongs of the *Strickland* test.

    14.    <u>Failure to Effectively Move for a Dismissal</u>.

Counsel moved to strike the prosecution's case when it rested, but offered no basis for the motion other than to "preserve the record." Elliott argues that grounds for mistrial existed and therefore counsel was ineffective in failing to move for dismissal on these grounds. This Court concurs with, and adopts the reasoning of, the Virginia Supreme Court:

> The record, including the trial transcript and the exhibits, demonstrates that the evidence was sufficient to overcome a motion to strike and to support petitioner's convictions . . . Petitioner fails to allege how a more specific motion to strike would have affected his case and fails to allege any viable basis upon which counsel should have sought a mistrial. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.
>
> 652 S.E.2d at 480-81.

15.    Failure to Put on a Defense.

Elliott's claims for failure to put on a defense largely rehash and restate his other claims

for habeas relief, such as counsel's failure to play the audio tape and failure to use character

testimony.  As the Virginia Supreme Court noted, Elliott fails to identify any additional witnesses

whose testimony would have had a reasonable probability of changing the outcome at trial.

Cumulative and boilerplate objections to trial strategy do not establish ineffective assistance of

counsel under *Strickland*.  *See also Lenz*, 593 S.E.2d at 305 ("Having rejected each of

petitioner's individual claims, there is no support for the proposition that such actions when

considered collectively have deprived petitioner of his constitutional right to effective assistance

of counsel.").

16.    Failure to Object to the Prosecution's Improper Closing Arguments.

Elliott further asserts cumulative habeas claims when he argues that his counsel failed to

object to the prosecution's closing argument, which allegedly maligned Elliott's character and

emphasized "uncharged" crimes such as theft, attempting to acquire a silencer, and fleeing from

the police.  The Court has addressed these specific arguments above, and will add only that the

trial transcript reveals no improprieties in the prosecution's closing argument.  The prosecution

was entitled to argue the truthfulness of prosecution witnesses, corroborating testimony, and

evidence adduced at trial.  The Court agrees with the Virginia Supreme Court that these claims

fail under *Strickland*.  *Elliott v. Warden*, 652 S.E.2d at 481.

17.    Cumulative Prejudice.

Elliott claims he was prejudiced by the cumulative effect of counsel's alleged failings.

26

"Having rejected each of petitioner's individual claims, there is no support for the proposition

that such actions when considered collectively have deprived petitioner of his constitutional right

to effective assistance of counsel." *Elliott v. Warden*, 652 S.E.2d at 481 (quoting *Lenz v.*

*Warden*, 593 S.E.2d 292, 305 (Va. 2004)); *see also Mueller v. Angelone*, 181 F.3d 557, 586 n.22

(4th Cir. 1999); *Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998) ("Having just

determined that none of counsel's actions could be considered constitutional error . . . it would be

odd, to say the least, to conclude that those same actions, when considered collectively, deprived

Fisher of a fair trial").

## B.     Counsel Rendered Ineffective Assistance at the Penalty Phase.

Elliott asserts additional grounds for ineffective assistance at the penalty phase of trial.

The Court will evaluate these claims in sequence.

### 1.     Failure to adequately develop and present mitigation evidence.

Elliott claims that counsel did not interview or call 27 mitigation witnesses, including

coworkers and childhood friends, who could have testified about his positive attributes and

perhaps convinced the jury to spare his life. "Although counsel should conduct a reasonable

investigation into potential defenses, *Strickland* does not impose a constitutional requirement that

counsel uncover every scrap of evidence that could conceivably help their client." *Tucker v.*

*Ozmint*, 350 F.3d 433, 442 (4th Cir. 2003). Counsel presented similar mitigation evidence

through six other witnesses, including Elliott's wife and six of his friends and coworkers, who

testified about Elliott's kindness and decency, and his service to his country. The Virginia

Supreme Court held that testimony from the other mitigation witnesses would have been

cumulative and would not have made a difference to the sentence. *Elliott v. Warden*, 652 S.E.2d

at 483-484. This Court agrees. Elliott offers no reason to believe that additional mitigation

witnesses would have dissuaded the jury from imposing the death penalty, and he cannot

demonstrate ineffectiveness merely by proffering additional, duplicative testimony. *Hedrick v.

True*, 443 F.3d 342, 353 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 10 (2006).

2.    Failure to renew penalty phase motions raised in Trial 1.

Elliott next claims that counsel was ineffective for failing to renew motions made in the

first trial. These motions sought to declare Virginia's death penalty statutes unconstitutional, to

instruct the jury to be unanimous on vileness and to exclude victim impact evidence. Each of

these motions was denied for good reason, as they were contrary to Virginia Supreme Court

authority. *Winston v. Commonwealth*, 604 S.E.2d 21, 29 (Va. 2004) (holding that the Virginia

death penalty statutes, and use of the term "vileness" as an aggravating factor, is constitutional);

*Hoke v. Commonwealth*, 377 S.E.2d 595, 602 (Va. 1989) (specific instruction on unanimity for

vileness is not required), *cert. denied*, 491 U.S. 910 (1989); *Beck v. Commonwealth*, 484 S.E.2d

898, 906 (Va. 1997) (holding that victim impact evidence is admissible), *cert. denied*, 522 U.S.

1018 (1997). Plainly, counsel was reasonable in not renewing motions unsupported in law, and

which were unsuccessful in the first trial.

3.    Failure to object to improper and prejudicial victim impact testimony.

Elliott argues that the victim impact testimony put on by the prosecution violated his Due

Process Clause rights. Specifically, Elliott points to the testimony of Dana Thrall's mother about

Dana Thrall's last minutes of life, and testimony of Dana Thrall's brother and sister-in-law about

28

the impact of the events on Dana's two boys, ages 4 and 6, which allegedly included hearsay testimony about their fear of the man who killed their mother and their psychological problems resulting from this tragedy.

Victim impact testimony is allowed under Virginia Code § 19.2-264.4. Such testimony is permitted during the sentencing proceeding so long as it is "necessary and relevant," *see Thomas v. Commonwealth*, 559 S.E.2d 652 (Va. 2002), and more probative than prejudicial, *see Beck v. Commonwealth*, 484 S.E.2d 898, 906 (Va. 1997). Under this statute, Ms. Thrall's mother was entitled to testify about her daughter's last minutes of life, and counsel made no error in failing to object during her testimony. The statements about Ms. Thrall's children were not hearsay because they were not offered for truth, *i.e.*, that the children actually feared for their lives or suffered psychologically. Rather, these statements were offered to show the severe psychological impact of the murders on the kids. *Elliott v. Warden*, 652 S.E.2d at 482. This determination of state law by the Virginia Supreme Court will not be disturbed by this Court. Accordingly, the Court finds no ineffective assistance based on counsel's failure to object to victim impact testimony.

4.    Failure to object to prosecution's improper closing arguments.

Elliott makes three sets of arguments that his counsel unreasonably failed to object to the prosecution's closing argument. First, he urges that his counsel unreasonably failed to object when the prosecution told the jury that the victims' families would "get some solace" from a death sentence, despite the parents of the victims allegedly opposing a death sentence. Next, Elliott criticizes his counsel for failing to object to the prosecution's "eleven separate statements" in its closing that Elliott would be a future danger. Third, Elliott asserts that his counsel should

29

have objected to the prosecution's statement that Elliott had sex with Gragg while she was sedated and unconscious.

As to the first argument, the Virginia Supreme Court correctly held that the prosecution's statement that members of the victims' families would get solace from a death sentence was fairly supported by the evidentiary record. 652 S.E.2d at 482. As to the second argument, Elliott claims that the prosecution made eleven statements on his future dangerousness, but fails to specifically identify any of those eleven statements. This is insufficient to support a habeas claim. Moreover, the Virginia Supreme Court dismissed this claim because counsel was not unreasonable in accepting the trial court ruling allowing general argument that a death sentence would prevent future harm. In short, counsel made reasonable objections at reasonable times, and having failed to prevail on those objections, there was nothing further to do. *Id.* at 482-483. As to Elliott's argument regarding sexual involvement with Gragg while she was sedated, the statement in closing was based on evidence of "circumstances surrounding the offense." *See* VA Code § 19.2-264.4(B). This Court agrees with the Virginia Supreme Court that such evidence was relevant to Elliott's fatal attraction to Gragg and thus to his motive to kill Finch. *Elliott v. Warden*, 652 S.E.2d at 483. Elliott's habeas claims based upon statements during closing argument are hereby denied.

5.     Failure to seek continuance or other relief based on the pre-sentence report.

Elliott claims that he received a copy of the presentence report only one day prior to sentencing, and asks the Court to infer that his counsel did not review that report. He asserts that counsel should have asked for a continuance of the hearing based on Clayton's Finch's statement in the report that Detective Hoffman "sabotaged" the defense. The Virginia Supreme Court

properly held that this claim was baseless speculation, that there was nothing in the report or elsewhere to substantiate this speculation, and dismissed this claim. *Id.* at 484. Nor is there any basis for a belief that asking for a continuance of the sentencing proceedings would have altered the outcome. This Court dismisses this claim under both prongs of *Strickland.*

6.   Cumulative effect of counsel's ineffective assistance in the penalty phase prejudiced Elliott.

Elliott again argues that he was prejudiced by the cumulative effect of counsel's alleged failings during the penalty phase. Again, "[h]aving rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." *Elliott v. Warden,* 652 S.E.2d at 481 (quoting *Lenz,* 593 S.E.2d at 305); *see also Mueller,* 181 F.3d at 586 n.22; *Fisher,* 163 F.3d at 852-53.

C.   *Claims of Ineffective Assistance Relating to the Jury Instructions/Verdict Forms.*

Elliott makes a volley of habeas claims based on his counsel's alleged ineffectiveness for failure to request certain jury instructions and failure to object to others. Applying *Strickland,* the Virginia Supreme Court found each of these claims deficient. 652 S.E.2d at 484-487. This Court agrees with the Virginia Supreme Court's conclusions, and shall address each of these claims below.

1.   The failure to request the "mere presence" instruction at guilt phase.

Elliott claims that counsel unreasonably failed to ask for a "mere presence" instruction,

which allegedly denied him due process of law by permitting him to be found guilty even if he was only present at the scene of the crimes.  In reality, counsel asked for the instruction but the trial court required that it be coupled with the "principal in the second degree" instruction.  Since Elliott's involvement as a principal in the second degree did not fit the defense theory of the case – that Elliott had no criminal involvement in the killings at all – counsel withdrew his request for a "mere presence" instruction.  The Virginia Supreme Court held that this tactical decision was reasonable given that Elliott's theory was that he committed no criminal act.  *Elliott v. Warden*, 652 S.E.2d at 484.  This Court holds that these claims do not meet *Strickland*'s "performance" or "prejudice" prongs.  Counsel cannot be faulted for refusing instructions contrary to his theory of the case.

      2.      <u>The absence of the "triggerman" instruction at guilt phase.</u>

The same reasoning applies to Elliott's next habeas claim, which argues ineffective assistance because counsel failed to seek the "triggerman" instruction.  The "triggerman" rule provides that a person who assists, but does not actually commit, a murder cannot be liable for capital murder; "only the actual perpetrator of the crime may be convicted of capital murder." *See* Va. Code § 18.2-18; *Johnson v. Commonwealth*, 255 S.E.2d 525 (Va. 1979).  The practical effect of this rule is that a triggerman can be liable only as a principal in the second degree. Thus, a triggerman instruction would have conflicted with the defense theory of the case that Elliott was not involved in the murders at all.  Nor does a triggerman instruction fit the evidence adduced at trial.  It was reasonable for counsel to elect not to seek this instruction, and the Court rejects this claim under *Strickland*.  652 S.E.2d at 484.

      3.      <u>Failure to object to the capital murder instruction and its verdict form at guilt</u>

phase.

Elliott claims that Jury Instruction No. 4, and verdict form APP 307, erroneously instructed the jury that if it did not find beyond a reasonable doubt that the Capital Murder was "part of the same transaction" as the other murder, then it must find Elliott guilty of First Degree Murder. Through a strained interpretation of the Virginia Code, Elliott argues that the proper instruction should have directed the jury to find Second Degree Murder if it did not find Capital Murder. This misapprehends Virginia law. Under the Virginia Code, premeditated murder – whether capital or not – is first degree murder. *See* Va. Code § 18.2-32. The Virginia Supreme Court has upheld a jury instruction on capital murder similar to Jury Instruction No. 4 used in this trial. *See Elliott v. Warden*, 652 S.E.2d at 484 (citing *Mackall v. Commonwealth*, 372 S.E.2d 759, 768 (Va. 1988), *cert. denied*, 492 U.S. 925 (1988)). Moreover, Elliott cannot show prejudice because the jury found him guilty of the capital murder of Dana Thrall and therefore an instruction giving the jury the option of finding second degree murder was immaterial. In short, these claims satisfy neither the performance nor the prejudice prongs of *Strickland*.

    4.    Failure to object to the verdict form for the Finch murder at guilt phase.

Elliott also objects to verdict form APP 309, used for the Finch murder, because it told the jury to find him guilty or not guilty "as charged in the indictment." Elliott relies on a synthetic contradiction between the verdict form and Jury Instruction No. 5, which required the jury to find three elements to convict of First Degree Murder. As the Virginia Supreme Court held, the jury instructions and verdict forms were clear and straightforward and conformed to the law. *Elliott v. Warden*, 652 S.E.2d at 484-485. Counsel need not make spurious objections. This claim fails under *Strickland* as well.

5.    Failure to request a victim impact testimony instruction at penalty phase.

Elliott next claims ineffective assistance because counsel failed to request a jury

instruction at the second trial on how to evaluate victim impact testimony, after counsel had

obtained such an instruction in the first trial.  But Elliott offers no authority holding that a victim

impact instruction at the penalty phase is mandatory.  The jury was properly instructed on the

need to find vileness as an aggravating factor before imposing a sentence of death, and there is no

evidence that the jury disregarded this instruction.  *Elliott v. Warden*, 652 S.E.2d at 485.  As

such, this habeas claim has no merit.

6.    Errors in capital murder verdict form at penalty phase.

Elliott objects to the capital murder verdict form because it referred to "Capital Murder,"

"the offense," and "torture" and "depravity of mind" without defining those terms.  He argues

that counsel violated *Strickland* by not objecting to this verdict form.  This ignores the fact that

the jury instructions provided definitions of these terms, and that the verdict form represented an

accurate statement of the statutory law.  Nor were these terms likely to confuse the jury.  Elliott

points to no evidence that the jury was, in fact, confused.  Unsubstantiated assertions of jury

confusion do not amount to a claim for ineffective assistance under *Strickland*.

7.    Failure to provide proper verdict form for the "life in prison" sentence at penalty
      phase.

Elliott misreads the "life in prison" sentence verdict form, which, he argues, told the

jurors that they must unanimously find that the prosecution failed to prove the aggravating factor

before they could give Elliott life in prison.  In Virginia, juries must decide criminal cases and

34

sentencing by unanimous verdict. Rule 3A:17(a), *Rules of Supreme Court of Virginia*; *Evans v.*
*Commonwealth*, 323 S.E.2d 114, 121 (Va. 1984), *cert. denied*, 474 U.S. 1025 (1985). Thus, the
verdict form conformed to Virginia law, and counsel made no error in failing to object to it. *See*
*Elliott v. Warden*, 652 S.E.2d at 485-486.

8.     Multiple assignments of errors and claims regarding Instruction No. 1 and the
        capital verdict form at penalty phase.

Elliott argues that the Virginia Supreme Court, on direct appeal, erred by refusing to
review errors he assigned to the trial court's rulings in the first trial. *See Elliott v.*
*Commonwealth*, 593 S.E.2d at 290. The Virginia Supreme Court was not required, after the
second trial, to review errors assigned during the first trial. Nor did counsel's choice not to
renew these motions at the second trial constitute ineffective assistance under *Strickland*. Simply
put, counsel need not assign error for every conceivable issue on appeal. Rather, attorneys have
the discretion to advance the issues most likely to prevail. *See Jones v. Barnes*, 463 U.S. 745,
751-752 (1983).

Elliott next argues that the trial court did not use standard jury instructions and verdict
forms, and that the Virginia Supreme Court mistakenly concluded that the instructions and forms
were standard. The language on the forms – "depravity of mind" and "torture" – came directly
from the Virginia statute at issue. *See* Va. Code § 19.2-264.4(D)(1). The trial court certainly
was not required to omit language from the statute defining "vileness" on the instructions and
forms pertaining to the vileness aggravating factor.

Elliott further contends that because there was no evidence of depravity or torture, the

35

trial court should have omitted those terms from the jury submissions. This is wrong for two reasons. First, as a matter of law, jury instructions and verdict forms that track the language of the statute are accurate statements of the law, and it is not improper to submit accurate statements of the law to the jury. *See Elliott v. Warden*, 652 S.E.2d at 486; *Tuggle*, 323 S.E.2d at 553. Second, as a matter of fact, there was evidence in this case to support a finding of torture. After murdering Ms. Thrall's boyfriend, Elliott then pistol-whipped her, shot her execution-style, and left her to die with her young children upstairs in the house. The jury reasonably could have concluded that such evidence supported "depravity of mind."

Nor was counsel required to ask for an instruction defining "depravity of mind," a phrase which does not require further definition under Virginia law, *see Tuggle v. Commonwealth*, 323 S.E.2d 539, 553 (Va. 1984), *rev'd on other grounds*, 471 U.S. 1096 (1985), or "aggravated battery," which was defined elsewhere in the instructions as force "beyond the minimum necessary to accomplish the act of murder."

Lastly, Elliott asserts that counsel failed to ask for an instruction that the jury's finding on the "vileness" factor be unanimous, but the jury was elsewhere instructed that it must reach unanimous verdict. *Elliott v. Warden*, 652 S.E.2d at 485-486.

9.   Failure to request instructions that the "defendant is presumed innocent of the aggravating factors," that "he does not have to testify in the penalty phase," and on the definition of "reasonable doubt."

Elliott next contends that the jury should have been instructed at the penalty phase that "defendant is presumed innocent of the aggravating factors," that "he does not have to testify in

the penalty phase," and on the meaning of "reasonable doubt." Elliott admits that the jury was instructed on the presumption of innocence, the Fifth Amendment right not to testify, and the meaning of "reasonable doubt" during the guilt phase of trial. There is no evidence of unresolved jury confusion carrying over into, or arising during, the penalty phase.

Moreover, an instruction that the defendant is "presumed innocent" would have been misleading and confusing at the penalty phase. Elliott already had been adjudged guilty of the crimes, and once the Commonwealth proved the existence of an aggravating factor, the burden shifted to Elliott to prove mitigating factors. Accordingly, this Court must reject these claims. *Elliott v. Warden*, 652 S.E.2d at 484, 487.

### D.    *Counsel Rendered Ineffective Assistance On Direct Appeal.*

Criminal defendants have a due process right to the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). The standard for ineffective assistance is the same for trial and appellate counsel, and counsel's actions are measured against the *Strickland* standard. 466 U.S. at 688; *Smith v. Murray*, 477 U.S. 527, 535-536 (1986). Counsel are not required to raise every possible issue on appeal; they are given considerable discretion in making tactical decisions. *Jones*, 463 U.S. at 751-752. Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Strickland*, 466 U.S. at 688. Furthermore, under the prejudice prong, a petitioner must show a reasonable probability that, but for appellate counsel's poor performance, he would have obtained a reversal or new trial. *Smith v. Robbins*, 528 U.S. 259, 285-286 (2000) ("[appellant] must show a reasonable probability that . . . he would have prevailed on his appeal").

Elliott advances an array of claims relating to the alleged ineffectiveness of his counsel on direct appeal:

1.    Failure to assign error to the penalty phase of trial.

Elliott rehashes his prior argument that the prosecution impermissibly argued future dangerousness during the penalty phase. As explained above, the trial court allowed a general argument that a death sentence was the appropriate punishment, in part because it would prevent future harm, and this ruling was affirmed by the Virginia Supreme Court. On state habeas appeal, the Virginia Supreme Court found that the jury was instructed that it could impose the death penalty only if it found the vileness factor proven beyond a reasonable doubt. *Elliott v. Warden*, 652 S.E.2d at 488. The instructions therefore clearly informed the jury that a death sentence had to be based on vileness, not future dangerousness. The jury is presumed to have followed the instructions and Elliott proffers nothing leading the Court to believe otherwise. The Court dismisses this claim.

2.    Failure to argue assignments of error.

The next contention is that counsel was ineffective for failing to argue five particular assignments of error. On state habeas appeal, the Virginia Supreme Court held, these assignments of error were without merit. *Id.* at 488. Counsel is not ineffective for failing to pursue arguments lacking merit. Furthermore, three of these assignments of error were not preserved at trial and thus would have been barred by Rule 5:25, *Rules of the Supreme Court of Virginia.* 652 S.E.2d at 488. Clearly, it is not deficient representation to focus an appeal on issues that were preserved at trial, and forego issues that were not.

38

3.     <u>Failure to cite authority requiring the adoption of a narrowing instruction regarding the three vileness factors.</u>

Next, Elliott recycles his habeas challenges to the jury instructions by arguing that counsel failed to convince the court to include a limiting instruction that specified how the three "vileness" factors are applied. As explained above, *supra* at 35-36, the jury instructions on vileness were proper. "Depravity of mind, aggravated battery, and torture are not discrete elements of vileness that would require separate proof but rather are 'several possible sets of underlying facts [that] make up [the] particular element'" of vileness. *Richardson v. United States*, 526 U.S. 813, 817 (1999). This claim is dismissed.

4.     <u>Failure to argue that the jury's verdict was not the product of a reasoned and dispassionate deliberation.</u>

Under Virginia Code § 17.1-313(C)(1), the Virginia Supreme Court must determine whether the jury imposed the death sentence "under the influence of passion, prejudice, or any other arbitrary factor." Elliott argues that his appellate counsel failed to argue on direct appeal that the jury's sentence violated this provision. However, on state habeas review the Virginia Supreme Court found that its prior review on direct appeal comported with Section 17.1-313(C)(1). *Elliott v. Warden*, 652 S.E.2d at 489. Elliott fails to articulate how counsel could have changed the Virginia Supreme Court's mind on direct appeal, and he offers no specific arguments that might have changed the outcome. As such, this claim fails under *Strickland*.

E.     *Cumulative Effect of all Preceding Ineffective Assistance of Counsel Claims.*

As before, Elliott argues that the "cumulative effect" of the preceding ineffective

assistance claims demonstrates that habeas relief is warranted. Again, "[h]aving rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." *Elliott v. Warden*, 652 S.E.2d at 489 (quoting *Lenz*, 593 S.E.2d at 305).

## F.   *The Handwritten Note Found In Appellate Record.*

Elliott contends that the trial court failed to inform him about a handwritten note, which he postulates was a jury question never brought to the attention of counsel. This note appeared in the manuscript record that was forwarded to the Virginia Supreme Court by the trial court Clerk. It stated: "Can you supply a more simplistic definition of reasonable doubt from a guilt or innocence point of view?" There is little reason to believe that this note was a jury question. The trial transcript does not suggest that any such note was submitted to the jury. The jury submitted questions on two occasions during the trial, and each time the court's procedure was to read the question to counsel and seek input from the attorneys on what action should be taken. This procedure was not initiated for a question on reasonable doubt.

On direct appeal, the Virginia Supreme Court concluded that this claim was pure speculation and that there was no evidence suggesting that the note was a jury question. *Elliott v. Commonwealth*, 593 S.E.2d at 282. On state habeas appeal, the Virginia Supreme Court found that the claim "was not cognizable in a habeas corpus proceeding" because Elliott's request for a hearing was not a jurisdictional defect remediable in a habeas proceeding. *Elliott v. Warden*, 652 S.E.2d at 487. This Court agrees with these prior holdings and adds that, under Virginia law, it is not reversible error to refrain from giving a jury instruction that defines "reasonable doubt." *See Strawderman v. Commonwealth*, 108 S.E.2d 376, 379 (Va. 1959) ("It should be remembered . . .

40

that on numerous occasions we have stated that instructions attempting to define reasonable

doubt should be discouraged as it is highly probable that any definition devised would be less

illuminating than the expression itself."). Thus, the trial court would have been under no

obligation to supply a definition of reasonable doubt, even had the jury asked for one.

### G.     Post-trial Destruction and/or Release of Human Biological Evidence Violated Elliott's Due Process Rights.

Elliott argues that his due process rights were violated by the Commonwealth when the

Prince William County Police Department allegedly destroyed two sets of stains/swabs that the

police took from the crime scene, and allegedly released components of Elliott's pickup truck, on

which it had found biological evidence, to an insurance company.  Relying on *Arizona v.

Youngblood*, Elliott argues that the government's bad faith destruction of "potentially useful

evidence" denied him due process. 488 U.S. 51, 58 (1988).  According to Elliott, bad faith was

present because the police supposedly admitted at the November 2006 hearing before the Circuit

Court that they deliberately destroyed and released the evidence – in violation of two Virginia

statutes. *See* Va. Code § 19.2-270.4 (authorizing destruction of trial evidence "after exhaustion

of all appellate remedies"); § 19.2-270.4:1 (prohibiting destruction of "human biological

evidence" in a death penalty case until after "the judgement is executed").

The Commonwealth argues that: federal habeas review of a claim for disposed-of

biological evidence is barred by a Virginia statute; the claim is precluded by the state habeas

statute of limitations; there was no bad faith by the police here and cases finding bad faith each

considered *pre-trial*, not post-trial, destruction of evidence; and no physical evidence introduced

at trial was destroyed or disposed of, nor was the critical physical evidence linking Elliott to the

41

murder scene.

As a threshold matter, Virginia Code § 19.2-270.4:1, "Storage, preservation and retention of human biological evidence in felony cases," expressly provides in subsection (E) as follows:

> An action under this section or the performance of any attorney representing the petitioner under this section shall not form the basis for relief in any habeas corpus or appellate proceeding.

Thus, this statutory provision plainly bars the habeas relief sought by Elliott. *See Lovitt v. Warden*, 585 S.E.2d 801, 816 (Va. 2003) ("in stating the procedural requirements relating to the retention of human biological evidence in Code § 19.2-270.4:1, the General Assembly also recognized that noncompliance with those procedures may occur and provided statutory language plainly excluding any such noncompliance as a basis for appellate or habeas corpus relief").

Moreover, this claim is barred from federal habeas review under *Gray v. Netherland*, 518 U.S. 152, 162 (1996). Elliott was required to present due process violations to the state court in a timely manner. This claim was not timely presented to the state court on direct appeal or during state habeas proceedings; indeed, the Virginia Supreme Court denied Elliott's motion "for leave to amend his habeas corpus petition with a *recently discovered* due process claim and to conduct discovery." *Elliott v. Warden*, 652 S.E.2d at 489 (emphasis added). As such, *Gray* precludes federal review. 518 U.S. at 162.

Finally, the physical evidence relating to the back fence gate – from which Elliott's DNA was collected, which established his presence at the murder scene – was not destroyed. Further, courts have not applied the bad-faith standard for constitutional due process violations to *post-*

trial destruction of evidence by police departments. *See Lovitt v. True*, 403 F.3d 171, 187 (4th

Cir. 2005).

For the reasons given above, the Court must dismiss this habeas claim.

**H.    *Exclusion of Polygraph Evidence Violated Elliott's Right to Confront***
**      *Witnesses.***

Elliott makes a Confrontation Clause argument based upon the trial court's exclusion of

evidence from two polygraphs administered to Gragg, which he contends would have rebutted a

false impression that Gragg had been truthful with the police.  At trial, Elliott argued that the

prosecution had "opened the door" to cross-examination of Gragg about the polygraphs when

Detective Hoffman referred to a "polygrapher" during his direct testimony.  On direct appeal, the

Virginia Supreme Court disagreed, reasoning that the doctrine of "curative admissibility" did not

compel the trial court to allow "inadmissible and unreliable" polygraph evidence, and that the

court correctly gave a curative instruction. *Elliott v. Commonwealth*, 593 S.E.2d at 283-284.

In Virginia, as well as in the Fourth Circuit, evidence that a witness has taken a polygraph

test is inadmissible. *Robinson v. Commonwealth*, 341 S.E.2d 159, 167 (1986) (holding that

results of a polygraph examination may not be used to impeach a witness); *U.S. v. A & S Council*

*Oil Co.*, 947 F.2d 1128, 1133 (4th Cir. 1991).  In light of this rule, this Court agrees with the

Virginia Supreme Court that the trial court made a reasonable decision to exclude evidence of

Gragg's polygraph tests.  Refusing to allow cross-examination on inadmissible polygraph

evidence did not violate the Confrontation Clause. *See A&S Council Oil Co.*, 947 F.2d at 1133

(explaining that Fourth Circuit law "precludes direct attacks on or bolstering of the credibility of

a witness through evidence that the witness has taken a polygraph test").

### I.    *Claims Found Procedurally Defaulted By the Virginia Supreme Court.*

The Virginia Supreme Court found that Elliott's *Brady* claims and *Napue/Giglio* claims were procedurally defaulted. Under *Gray v. Netherland*, 518 U.S. 152, 162 (1996), and *Fisher v. Angelone*, 163 F.3d 835, 851-52 (4th Cir. 1998), *cert. denied*, 526 U.S. 1035 (1999), "a federal habeas court may not review a claim when a state court has declined to consider the claim's merits on the basis of an adequate and independent state procedural rule." *Fisher*, 163 F.3d at 844. A rule is adequate "if it is regularly and consistently applied by the state court," and is independent "if it does not depend on a federal constitutional ruling." *See Yeats v. Angelone*, 166 F.3d 255, 261-62 (4th Cir. 1999) (internal citations and quotations omitted). When a state court has declined review under a state procedural rule, "concerns of comity and federalism counsel in favor of a federal habeas court declining to reach the merits of the federal claim." *Id.* at 261. Thus, the federal court should dismiss the defaulted habeas claim unless the petitioner shows either cause for the default and prejudice arising from the default, or a fundamental miscarriage of justice. *Fisher*, 163 F.3d at 844.

Here, the Virginia Supreme Court held that the *Brady* claims "are procedurally defaulted because these non-jurisdictional issues could have been raised at trial and on direct appeal and, thus, are not cognizable in a petition for a writ of habeas corpus." *Elliott v. Warden*, 652 S.E.2d at 473 (citing *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974)). In *Slayton*, the Virginia Supreme Court held that "when a prisoner has been afforded a fair and full opportunity to raise and have adjudicated the question . . . in his trial and upon appeal," and has failed to do so, the "prisoner is not entitled to use habeas corpus to circumvent the trial and appellate process for an inquiry into an alleged non-jurisdictional defect of a judgment of conviction." 205 S.E.2d at 682.

The *Slayton* rule has been upheld by the Supreme Court and the Fourth Circuit as an "independent" and "adequate" state procedural rule. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Reid v. True*, 349 F.3d 788, 804 (4th Cir. 2003), *cert. denied*, 540 U.S. 1097 (2003); *Wright v. Angelone*, 151 F.3d 151, 159-60 (4th Cir. 1998), *cert. denied*, 525 U.S. 946 (1998).

In accord with these authorities, this Court holds that each of Elliott's *Brady* and *Napue/Giglio* claims are procedurally defaulted and barred from federal habeas review. The Court now turns to whether Elliott can establish an exception by showing cause for default and resulting prejudice, or a fundamental miscarriage of justice, that would warrant federal habeas review. Cause for default exists only when the "prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Coleman v. Thompson*, 501 U.S. 722, 753 (1991). As shown below, there is no cause and prejudice for any of Elliott's *Brady* claims.

     **a.**    **Claims Under *Brady v. Maryland*.**

     1.    Failure to produce statements of the Thrall boys.

Elliott alleges that the Commonwealth did not disclose exculpatory statements allegedly made by the Thrall boys. He relies on several affidavits containing hearsay statements that one of the Thrall boys' claimed to see "either a black man or a man wearing black running from the rear of the townhouse." *Elliott v. Warden*, 652 S.E.2d at 471. These affidavits came from a neighbor, from Elliott's habeas investigator, and from the Thrall boys' grandfather. None of these affidavits contains admissible evidence, much less establishes that the police or prosecution had any knowledge of the alleged exculpatory statements. *Id.* Thus, there is no cause for default or prejudice, and this claim fails.

45

2.      Failure to produce photographs provided by victim Robert Finch's parents.

Elliott alleges that the prosecution failed to produce photographs of Robert Finch taken

after he was severely beaten by Gragg's friends and family members.  Elliott claims that these

photographs were exculpatory because they tended to support his theory that other people had a

motive for killing Finch.  During trial, Elliott's counsel claimed to have information that the

photographs existed, the prosecution denied it, and counsel made no objection or motion based

on non-disclosure of exculpatory evidence.  If counsel believed these photographs existed, he

could have moved for disclosure during trial.  He did not.  Elliott now offers no cause for his

default on this issue during state proceedings, beyond a bald assertion that the Commonwealth

was "feigning ignorance of evidence."  This Court will not impute a severe ethical breach to the

prosecution based on such speculation.

Moreover, it is unlikely the alleged photographs would have been admissible.  On direct

appeal, the Virginia Supreme Court held that evidence of a prior assault on Finch by Gragg's

associates was "too tenuous and speculative" to be relevant, and therefore was properly excluded

at trial. *Elliott v. Commonwealth*, 593 S.E.2d at 288.  Thus, the alleged photographs would have

been excluded, and therefore Elliott cannot establish prejudice.

3.      Failure to produce alleged tape recording of the "smoke break conversation" and
        written statements regarding that conversation.

Next Elliott postulates that the police recorded a conversation between Gragg and

investigators during a smoke break from her interview, and composed written reports

memorializing the substance of these conversations.  He claims the Commonwealth failed to

produce this evidence of the "smoke break conversation."  At trial the prosecution represented

46

that it had produced "every statement that [Gragg] made to any of [our] agents." When questioned directly by the trial court, the prosecution denied the existence of a recording or written statement of the smoke break conversation. The Virginia Supreme Court held this claim defaulted, both on direct review and state habeas review. 593 S.E.2d at 288; 652 S.E.2d at 472.

The existence of recordings or written statements of the smoke break conversation is pure conjecture. Elliott has no evidence of their existence. The prosecution team and three police detectives all denied the existence of such materials, the trial court saw no cause for further investigation, and the Virginia Supreme Court twice denied relief on this claim. Furthermore, to show cause for default and prejudice Elliott would need evidence that the transcription of the smoke break conversation contained exculpatory material. He has no such evidence. In fact, the trial record shows quite the opposite – at trial, Gragg testified that during the smoke break she told Detective Hoffman about phone calls with Elliott during which he made incriminating statements. Thus, the Court finds no cause for default and no prejudice.

4.    Failure to produce third polygraph report.

In his next *Brady* claim, Elliott asserts that the police gave Gragg a third polygraph on May 14, 2001, and then failed to produce the report from this polygraph despite a court order to produce all polygraph reports. He relies on a discrepancy in the dating of the second polygraph, which bears a handwritten date "5-10-2001" near the examiner's signature for "time of testing," but the typed report reads "Date: 5/14/01" (the following Monday). The most logical inference is that these dates both refer to the same polygraph, which was administered on May 10 with a report prepared on May 14. Four witnesses (Ebert, Willett, Detective Hoffman, Marlett) confirmed that Gragg was administered only two polygraphs. The Virginia Supreme Court

47

concluded that the record shows only two polygraph tests administered to Gragg, one on January

12, 2001, and another on May 10, 2001. *Elliott v. Warden*, 652 S.E.2d at 472. Accordingly, the

Court found his claim "factually without merit." *Id*. This Court affirms that finding, as Elliott

has not proven by "clear and convincing" evidence that this factual determination by the state

court was erroneous. *See* 28 U.S.C. § 2254(e)(1). Nor can Elliott show prejudice. There is no

evidence that any third polygraph would have contained exculpatory material.

     5.     <u>Failure to comply with constitutional duties.</u>

     Elliott asserts a *Brady* violation for the alleged failure of the Commonwealth to

investigate potential leads suggesting that another perpetrator committed the crimes. He relies on

a hearsay statement by William Thrall and his own investigator's critique of the police

investigation. The Virginia Supreme Court found this claim procedurally defaulted. *Elliott v.*

*Warden*, 652 S.E.2d at 472. Elliott offers no cause for the default. Moreover, police are allowed

to cease investigation once they believe that they have apprehended the murderer. An *ex post*

*facto* assertion that a police investigation was incomplete – without evidence of bad faith by the

police – does not create a due process violation. *See Holdren v. Legursky*, 16 F.3d 57, 60 (4th

Cir. 1994) (failure to test evidence at the scene or conduct an investigation in a particular way

does not state a due process violation), *cert. denied*, 513 U.S. 831 (1994).

     Nor does this claim constitute a *Brady* violation. *Brady* obligates the government to

disclose exculpatory information in its possession; it applies only "when evidence is 'known to

the prosecution but unknown to the defense.'" *Lovitt v. True*, 403 F.3d 171, 185 (4th Cir. 2005)

(quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

     6.     <u>Cumulative materiality.</u>

Finally, Elliott argues the alleged *Brady* violations, aggregated together, show materiality. The Virginia Supreme Court found this claim procedurally defaulted as well, 652 S.E.2d at 472-473, and this Court agrees. Having found each of the individual claims procedurally defaulted, the Court must reject the argument that they accumulate to a *Brady* violation.

**b.   Claims Under *Napue/Giglio*.**

1.   <u>The Commonwealth sponsored perjured testimony from Officer Leo.</u>

Elliott claims that his rights were violated under *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150, 153 (1972). A *Napue* claim "requires a showing of the falsity and materiality of testimony and the prosecutor's knowledge of its falsity." *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002). Elliott claims that Officer Thomas Leo falsely testified as to the date (January 2, 2001) he collected the blood containing Elliott's DNA from the back gate of the townhouse. The Virginia Supreme Court found this claim procedurally defaulted, and this Court concurs. *Elliott v. Warden*, 652 S.E.2d at 473.

Based on the inadmissible hearsay testimony of his state habeas investigator, Elliott alleges that the Commonwealth hid evidence that Officer Leo's testimony was false. The investigator claims that a retired police officer, Mr. Zinn, told him that Officer Leo collected the blood sample from the back gate within a day or two of January 2, 2001. By contrast, Officer Leo testified that he collected the sample on January 2, 2001, and contemporaneously recorded that date on the collection bag. Another officer, Detective Watson, supervised the collection and confirmed by sworn affidavit that it was done on January 2. Furthermore, there is no viable *Napue* claim because – even assuming Officer Leo's testimony was false – Elliott offers no basis for a belief that the prosecutor knew of this falsity. *Basden*, 290 F.3d at 614. Nor would the date

49

of collection affect the admissibility of the evidence; the chain of custody was sound and it was

properly authenticated. Thus, Elliott cannot show cause for default or resulting prejudice for this

claim.

     2.    The Commonwealth sponsored perjured testimony from Detective Hoffman and

          Gragg.

     Elliott next claims that Detective Hoffman testified falsely three times, that Gragg

testified falsely about incriminating phone calls that she received from Elliott, and that the

Commonwealth improperly "sponsored" the testimony of these witnesses. The Virginia Supreme

Court also found these claims procedurally defaulted. *Elliott v. Warden*, 652 S.E.2d at 472-473.

Elliott does not proffer any cause for his default or prejudice resulting from the default. If he

believed these witnesses were falsely testifying at trial, his counsel could have impeached them

during cross-examination, called other witnesses to cast doubt on their credibility, or raised these

issues on appeal. His failure to do so bars this Court from reviewing these claims under *Slayton*,

205 S.E.2d at 682..

     3.    The alleged May 10, 2001 written statement.

     Elliott claims that Gragg testified that, during a smoke break on May 10, 2001, she told

Detectives Hoffman and Masterson about a phone conversation with Elliott wherein he discussed

"bloody bags" and "police swarming" at the scene. Elliott further claims that Gragg testified that

one of the detectives wrote down what she said and had her initial and sign the written statement.

     These claims attempt to recast Elliott's *Brady* claims on the smoke break conversation as

*Napue* claims. For the reasons discussed above, such claims are procedurally defaulted. *Elliott*

*v. Commonwealth*, 593 S.E.2d at 288; *Elliott v. Warden*, 652 S.E.2d at 472.  Elliott argued that

Gragg perjured herself to the Virginia Supreme Court on direct appeal, and the Court held the

argument waived under Rule 5:25.  *Elliott*, 593 S.E.2d at 286-287.  Elliott offers no cause

excusing this default, and cannot show prejudice given that the comments allegedly made during

the smoke break conversation were not helpful to his case.

Moreover, the record shows that the trial court considered the prosecutor's truthfulness

about his lack of knowledge of these alleged written statements.  As such, there is no *Napue*

claim.  *Basden*, 290 F.3d at 614 (*Napue* "requires a showing of the falsity and materiality of

testimony and the prosecutor's knowledge of its falsity").

c.      **Miscarriage of Justice.**

Lastly, Elliott argues that his procedurally defaulted claims should be considered by this

Court because there has been a fundamental miscarriage of justice.  *Murray v. Carrier*, 477 U.S.

478, 488 (1986).  For there to be a miscarriage of justice, the defendant must be actually innocent

of the capital crime, or innocent of the aggravating factor qualifying him for the death penalty.

*Schlup v. Delo*, 513 U.S. 298, 301 (1995); *Sawyer v. Whitley*, 505 U.S. 333 (1992).  Neither

circumstance is present here.  Elliott was convicted of first degree murder and capital murder by

a jury of his peers.  The evidence at trial unequivocally proved that Elliott committed these

murders.  Police found blood containing his DNA on the inside of the padlocked back gate of the

townhouse where the murders occurred.  When police questioned him the day after the murders,

Elliott had an abrasion on his hand and bandages in his truck.  Forensic testing a week later found

blood bearing his DNA on a seat cushion in his truck.

Further, his truck was seen in the neighborhood by a witness minutes before neighbors

51

reported hearing gunshots. Elliott even admitted to police that he had been in the neighborhood the morning of the murders and that he left his truck while there, but gave no explanation for why he would be more than 50 miles from his home at four in the morning. In addition, Elliott's obsession with Gragg, the victim Finch's ex-wife, gave him a clear motive. Gragg testified that Elliott called her early the morning of the murders, said that he was "tired of this s*** and was going to take care of it" and hung up. He also called her after the murders and told her that "all of our problems had been taken care of," and later told her that he was looking for a place "to dump . . . these bloodied black trash bags from the mess that Jerry had made." Forensic analysis of the bullets recovered from the crime scene showed that each was fired from the same gun, thus precluding any inference of multiple killers.

Finally, the grisly detail of Elliott's murder of Dana Thrall supported the jury's finding of the "vileness" aggravating factor beyond a reasonable doubt. He shot a mother in her home with her two small kids upstairs,[1] after killing her boyfriend in front of her. Elliott shot Ms. Thrall multiple times in her head and once in her chest – at close range, as evidenced by the defensive bullet wound to her hand. He pistol-whipped her in the head. He callously left her to die an agonizing death, with her children upstairs. Under these facts, the jury's finding of vileness was reasonable, and there was no miscarriage of justice.

## V.    Conclusion

For all of the reasons stated above, the Respondent's Motion to Dismiss must be granted and the Elliott's Petition for Writ of Habeas Corpus must be dismissed in full. All other pending

---

[1] Given that Elliott admitted he had been to the house "hundreds of times," the jury could infer that Elliott knew Thrall lived in that house with her kids.

motions in this matter are hereby deemed moot.  The stay of execution entered by Order of this

Court on May 6, 2008, is hereby lifted.


       ENTERED this 31st day of March, 2009.



                                /s/

                            Liam O'Grady
                            United States District Judge

Alexandria, Virginia